**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| TRUESIGHT COMMUNICATIONS LLC,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | ) | Case No. 2:26-cv-00<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Truesight Communications LLC ("Truesight" or "Plaintiff") for its Complaint against Defendant Google LLC ("Google" or "Defendant") for patent infringement alleges as follows:

**THE PARTIES**

1. Truesight is a limited liability company organized and existing under the laws of the State of Texas, with its principal place of business located at 209 East Austin Street, Marshall, TX 75670.

2. Defendant Google is a Delaware corporation and maintains its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043, and may be served with process via its registered agent, Corporation Service Company at 251 Little Falls Drive, Wilmington, Delaware 19808. On information and belief, Google does business in Texas, directly or through intermediaries, and offers its products and/or services, including those accused herein of infringement, to customers and potential customers located in Texas, including in the judicial Eastern District of Texas.

## JURISDICTION

3. This is an action for patent infringement arising under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq*. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1332, 1338 and 1367.

4. This Court has specific and personal jurisdiction over Defendant consistent with the requirements of the Due Process Clause of the United States Constitution and the Texas Long Arm Statute. Upon information and belief, Defendant has sufficient minimum contacts with the forum because Defendant transacts substantial business in the State of Texas and in this Judicial District. Further, Defendant has, directly or through subsidiaries or intermediaries, committed and continues to commit acts of patent infringement in the State of Texas and in this Judicial District as alleged in this Complaint, alleged more particularly below.

5. Venue is proper in this Judicial District as to Defendant pursuant to 28 U.S.C. §§ 1391 and1400(b). Google is registered to do business in Texas and, upon information and belief, Google has transacted business in the Eastern District of Texas and has committed acts of direct and indirect infringement in the Eastern District of Texas. Google has regular and established places of business in this Judicial District as set forth below and is deemed to reside in this Judicial District.

6. Google is a multi-national technology company that collects, stores, organizes, and distributes data. In addition to its service model for distribution of data (*e.g.*, movies, search results, maps, music, etc.), Google has an expansive regime that gathers data on residents of this District through the hardware devices it sells (*e.g.*, phones, tablets, smartwatches, and home audio devices) and, also, through the operating systems and apps it provides. As an example, Google gathers data

when a resident runs its operating systems and apps (*e.g.*, location services).[1] As another example, Google gathers data when a resident interacts with Google's plethora of services such as search, email, music, and movie streaming. *See* https://safety.google/privacy/data/ (indicating that Google gathers data from "things you search for," "Videos you watch," "Ads you view or click," "Your location," "Websites you visit," and "Apps, browsers, and devices you use to access Google services"). As yet another example, Google gathers data from "where you've been," "everything you've ever searched— and deleted," "all the apps you use," "all of your YouTube history," "which events you attended, and when," "information you deleted [on your computer]," "your workout routine," "years' worth of photos," and "every email you ever sent."[2] In addition to extensive data gathering of information on residents of this District, Google has a substantial presence in this District directly through the products and services Google provides residents of this District (some of which also gather data).[3]

7. Google describes itself as an "information company."[4] Its vision is "to provide access to the world's information in one click," and its mission is "to organize the world's

---

[1] *See, e.g.*, "AP Exclusive: Google tracks your movements, like it or not," https://apnews.com/828aefab64d4411bac257a07c1af0ecb/AP-Exclusive:-Google-tracks-yourmovements,-like-it-or-not.

[2] *See* https://www.theguardian.com/commentisfree/2018/mar/28/all-the-data-facebook-google-has-on-you-privacy.

[3] Non-limiting examples include Google Search, Maps, Translate, Chrome Browser, YouTube, YouTube TV, Google Play Music, Chromecast, Google Play Movies and TV, Android Phones, Android Wear, Chromebooks, Android Auto, Gmail, Google Allo, Google Duo, Google+, Google Photos, Google Contacts, Google Calendar, Google Keep, Google Docs, Google Sheets, Google Slides, Google Drive, Google Voice, Google Assistant, Android operating system, Project Fi Wireless phone systems, Google Pixel, Google Home, Google Wifi, Daydream View, Chromecast Ultra.

[4] *See* "This Year's Founder's Letter" by Alphabet CEO, Sundar Pichai, https://blog.google/inside-google/alphabet/this-years-founders-letter/.

information and make it universally accessible and useful."[5] Making information available to people wherever they are and as quickly as possible is critical to Google's business.

*Google Global Cache (GGC)*

8. Google's CEO, Sundar Pichai, explained, "We want to make sure that no matter who you are and where you are or how advanced the device you are using—Google works for you."[6] To meet this goal, Google developed a content delivery network that it calls the Edge Network.

9. One non-limiting example of physical presence in this Judicial District is Google's Edge Network. Google provides web-based products and services, such as Google Maps, Find My Device, and Google Chrome, to users throughout the world, including in this Judicial District. These products and services are in high demand. Google reports that the Android operating system has more than 2 billion monthly active devices, and Google Maps surpassed 1 billion users as of May 2017.[7]

10. Google's Edge Network, itself, has three elements: Core Data Centers, Edge Points of Presence, and Edge Nodes.[8] The Core Data Centers (there are eight in the United States) are used for computation and backend storage. Edge Points of Presence are the middle tier of the Edge Network and connect the Data Centers to the internet. Edge Nodes are the layer of the network closest to users. Popular content, including Google Maps, Google Messages, mobile apps, and other digital content from the Google Play store, is cached on the Edge Nodes, which Google refers to as Google Global Cache or "GGC."

---

[5] https://panmore.com/google-vision-statement-mission-statement.
[6] https://time.com/4311233/google-ceo-sundar-pichai-letter/.
[7] *See* https://www.theverge.com/2017/5/17/15654454/android-reaches-2-billion-monthly-activeusers.
[8] https://peering.google.com/#/infrastructure.

11. Google Global Cache is recognized as one of Google's most important pieces of infrastructure,"[9] and Google uses it to conduct the business of providing access to the world's information. GGC servers in the Edge Nodes function as local data warehouses, much like a shoe manufacturer might have warehouses around the country. Instead of requiring people to obtain information from distant Core Data Centers, which would introduce delay, Google stores information in the local GGC servers to provide quick access to the data.

12. Caching and localization are vital for Google's optimization of network resources. Because hosting all content everywhere is inefficient, it makes sense to cache popular content and serve it locally. Doing so brings delivery costs down for Google, network operators, and internet service providers. Storing content locally also allows it to be delivered more quickly, which improves user experience. Serving content from the edge of the network closer to the user improves performance and user happiness. To achieve these benefits, Google has placed Edge Nodes throughout the United States, including in this Judicial District. Google describes these Edge Nodes as the workhorses of video delivery.

13. Google's GGC servers are housed in spaces in this Judicial District leased by Google. Google's GGC servers are housed in spaces leased by Google from Internet Service Providers (ISPs) whose networks have substantial traffic to Google and are interested in saving bandwidth. Hosting Google servers allows ISPs to save both bandwidth and costs, as they do not incur the expense of carrying traffic across their peering and/or transit links.

14. When an ISP agrees to host a GGC server, the parties enter into a Global Cache Service Agreement, under which Google provides:

---

[9] https://www.boostability.com/content/why-google-cache-is-important-to-your-seo

- hardware and software— including GGC servers and software— to be housed in the host's facilities;
- technical support; service management of the hardware and software; and
- content distribution services, including content caching and video streaming.

In exchange, the host provides, among other things, a physical building, rack space where Google's computer hardware is mounted, power, and network interfaces. All ownership rights, title, and intellectual property rights in and to the equipment (*i.e.*, the hardware and software provided by Google) remain with Google and/or its licensors.

15. Historically, multiple ISP-hosted GGC servers have been located in this Judicial District. Google provided the location of its GGC servers, namely, Sherman, Tyler, and Texarkana. Current evidence establishes that Google's GGC servers are still hosted in these cities.




Source: *Uniloc 2017 LLC v. Google LLC*, Case No. 2:18-cv-00550, Dkt. 1 at 8 (E.D. Tex. 2018); https://peering.google.com/#/infrastructure.

16. Google's current Edge Network page states that GGC Edge Nodes are Google-supplied servers that network operators and ISPs deploy inside their own networks, where popular Google content including YouTube and Google Play is cached and served to users.[10]

17. In April 2025, Google's Vice President of Global Infrastructure identified Google Global Cache among the technologies Google uses to deliver streaming video and stated that Google's network included more than 3,000 media-content-delivery-network locations worldwide.[11]

18. Netify is a network-intelligence provider that uses deep packet inspection and IP/network datasets to identify Internet applications, CDNs, autonomous systems, and network providers. Netify's Google Edge CDN dataset specifically identifies GGC infrastructure and the ISP networks on which Google-related traffic is observed.[12] Netify's current U.S. Google Edge CDN dataset defines the service as including GGC infrastructure deployed inside ISP partner networks and specifically lists both Optimum AS19108 and Cable One AS11492 among U.S. networks associated with Google Edge CDN.

[10] *See* https://peering.google.com/static/js/site/modules/pages/infrastructure.html.
[11] *See* https://cloud.google.com/blog/products/networking/google-global-network-principles-and-innovations.
[12] *See* https://www.netify.ai/products/netify-informatics.

**Google Edge CDN Other Networks - United States**

| ASN Label | ASN | IP Count | Sample IP |
|---|---|---|---|
| Panhandle Telecommunications S... | AS11067 | 9 | 65.79.192.20 |
| Matanuska Telecom Association | AS11090 | 3 | 64.4.226.190 |
| C Spire Fiber | AS11272 | 14 | 76.8.251.254 |
| Cable One | AS11492 | 24 | 152.37.212.30 |
| Smithville Digital | AS11550 | 4 | 66.244.74.94 |
| Pioneer Long Distance | AS11650 | 3 | 155.94.111.94 |
| Zayo Bandwidth | AS11686 | 3 | 96.4.63.158 |
| Breezeline | AS11776 | 6 | 146.168.122.78 |
| Airstream Communications | AS11796 | 13 | 69.147.222.94 |
| Fidelity Communication Interna... | AS11976 | 7 | 72.172.194.110 |
| Adams TelSystems | AS12033 | 6 | 66.226.125.222 |
| Conway | AS12231 | 3 | 96.31.222.206 |
| Fidium | AS13333 | 3 | 72.22.4.190 |
| FirstDigital Communications | AS13415 | 3 | 97.75.185.190 |
| Surf Air Wireless | AS13428 | 3 | 76.77.113.238 |
| Buckeye Cablevision | AS13490 | 9 | 72.240.108.126 |
| University of Vermont | AS1351 | 3 | 132.198.200.222 |
| FirstLight Networks | AS13536 | 12 | 66.152.103.142 |
| Uniti Fiber Holdings | AS13760 | 6 | 142.190.110.222 |
| Troy Cablevision | AS13825 | 4 | 96.47.87.62 |
| Fidium | AS13977 | 13 | 64.222.212.222 |
| Sierra Tel Internet | AS14750 | 3 | 64.118.108.254 |
| Unite Private Networks | AS15164 | 3 | 74.51.221.62 |
| Nortex Communications | AS16823 | 3 | 135.84.152.14 |
| TEC of Jackson | AS17253 | 3 | 65.183.116.126 |
| PRTC | AS18671 | 3 | 64.53.59.126 |
| Everfast Fiber Networks | AS18712 | 3 | 64.126.1.254 |
| Optimum | AS19108 | 27 | 75.110.3.158 |

Source: https://www.netify.ai/resources/cdn/google-cloud-cdn/country/us.

19. PeeringDB's current record for AS11492 identifies the network operator as Cable One, Inc., states that it is also known as "CableONE, Sparklight," and identifies Sparklight's website as the company website.[13]

20. For at least Tyler, Optimum reported in October 2025 that it had invested $9 million in Tyler infrastructure during the preceding two years and was constructing 40 miles of fiber with multiple redundant paths connecting Tyler facilities back to an Optimum network hub.[14] IPinfo's

[13] *See* https://www.peeringdb.com/asn/11492.
[14] *See* https://www.optimum.com/articles/communities/optimum-tyler-tx-emergency-services-fiber-investment.

current AS19108 data identifies AS19108 as Optimum and identifies 209.33.64.198 as an "important router" on AS19108 located in Tyler, Texas, establishing that the same Optimum autonomous system associated with Google Edge CDN/GGC has network infrastructure in Tyler.[15]

21. For at least Sherman, Sparklight reported in October 2025 that it had invested nearly $24 million across Denison, Sherman, and neighboring areas in new technology and upgrades to its fiber-optic network.[16] IPinfo's current lookup of 69.92.60.135 places that address in Sherman, Texas, assigns it to Cable One AS11492, and identifies its hostname as 69-92-60-135.cpe.sparklight.net, establishing that the Cable One/Sparklight ASN associated with Google Edge CDN/GGC operates network infrastructure in Sherman.[17] IPinfo's current measurements of Cable One AS11492's 160.3.187.0/24 network identify multiple "important routers" in Sherman, establishing a substantial AS11492 network presence in Sherman.[18]

22. For at least Texarkana, IPinfo's current lookup of 96.18.15.60 places that address in Texarkana, Texas, assigns it to Cable One AS11492, and identifies its hostname as 96-18-15-60.cpe.sparklight.net, establishing that the Cable One/Sparklight ASN associated with Google Edge CDN/GGC operates network infrastructure in Texarkana.[19] IPinfo's current measurements of Cable One AS11492's 160.2.35.0/24 network identify multiple "important routers" in Texarkana, further establishing a substantial AS11492 network presence in Texarkana.[20]

---

[15] *See* https://ipinfo.io/AS19108.
[16] *See* https://www.sparklight.com/news/sparklight-completes-fiber-network-expansion-bringing-multigig-internet-to-downtown-denison.
[17] *See* https://ipinfo.io/69.92.60.135.
[18] *See* https://ipinfo.io/AS11492/160.3.187.0/24.
[19] *See* https://ipinfo.io/96.18.15.60.
[20] *See* https://ipinfo.io/AS11492/160.2.35.0/24.

23. The photographs below show Google's GGC servers hosted by Suddenlink (now Optimum[21]) and the building where they are located at 322 North Glenwood Boulevard, Tyler, Texas 75702.


Exterior


Interior Rack Spaces


Google GGC Servers

24. Google caches content on these GGC servers located in this Judicial District.

25. Google's GGC servers located in this Judicial District store and serve copies of popular Google-controlled static content requested by local users, including at least YouTube and Google Play content.[22] At a minimum, the ISP-hosted GGC servers contain locally cached copies of popular Google content, particularly YouTube media objects and Google Play downloadable content. Google Play's current architecture includes APK binaries and updates as well as downloadable game asset packages containing resources such as textures, shaders, and sounds.[23] There activities are related and necessary to the infringing activities accused herein.

26. Google's GGC servers located in this Judicial District deliver cached content for the items in the preceding paragraph to residents in this Judicial District.

---

[21] *See* https://www.optimum.net/pages/transition.html.
[22] *See* https://cloud.google.com/blog/products/infrastructure/google-network-infrastructure-investments.
[23] *See* https://support.google.com/interconnect/answer/7658593?hl=en; https://peering.google.com/static/js/site/modules/pages/infrastructure.html.

27. Google generates revenue (a) by delivering video advertising; (b) from apps; and (c) from digital content in the Google Play store.

28. Google treats its GGC servers in this Judicial District the same as it treats all its other GGC servers in the United States.

29. Google not only exercises exclusive control over the digital aspects of the GGC but also exercises exclusive control over the physical server and the physical space within which the server is located and maintained.

30. This Judicial District has previously determined that the GGC server itself and the place of the GGC server, both independently and together, meet the statutory requirement of a "physical place." *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442-JRG, Dkt. 235 at 24 (E.D. Tex. July 19, 2018).

31. Likewise, this Judicial District has determined that GGC servers and their several locations within this Judicial District constitute "regular and established place[s] of business" within the meaning of the special patent venue statute. *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442-JRG, Dkt. 235 at 38 (E.D. Tex. July 19, 2018).

32. Similarly, this Judicial District has determined that the GGC servers and their locations within the various ISPs within this Judicial District are "places of Google" sufficient to meet the statutory requirement of § 1400(b). *See Seven Networks, LLC v. Google LLC*, Case No. 2:17-cv-00442- JRG, Dkt. 235 at 41 (E.D. Tex. July 19, 2018).

*<u>Google's Wi-Fi at Starbucks Locations in this Judicial District</u>*

33. Google provides Wi-Fi infrastructure and Wi-Fi service at Starbucks locations in this Judicial District. Google and Starbucks entered into an agreement in which Google provides its Google Wi-Fi or Google Fiber service at all Starbucks locations in this Judicial District,

including at Starbucks stores and at Target stores.[24] First-time customers connect and use Google Wi-Fi on their devices in this Judicial District by selecting "Google Starbucks" from their respective device's list of available wireless networks and entering their respective name, email address, and postal code. Return customers are automatically connected to Google Wi-Fi on their respective devices at any Google Wi-Fi location. Upon connecting to the Google Wi-Fi locations in this Judicial District, Google provides connected customers with Internet access over Google's infrastructure and services.




Source: https://www.starbucks.com/store-locator?map=32.49882,-94.568155,11z&place=Marshall%2C%20TX%2C%20USA.

34. Google uses its Google Wi-Fi infrastructure and Google Wi-Fi services at Starbucks locations in this Judicial District to provide customers with telecommunications services through its own phone carrier network, Google Fi. Google Fi is owned and operated by Google. In order to use Google Fi phone service in this Judicial District, Google provides its customers with special SIM cards and software to connect to and automatically switch between four sources

[24] https://www.starbucks.com/store-locator?map=32.467135,-95.387478,8z.

of network infrastructure and services: T-Mobile, Sprint, US Cellular, and public Wi-Fi networks. As described below, Google has entered into agreements with T-Mobile, Sprint, and US Cellular to lease the carriers' infrastructure and services to provide Google Fi customers with voice and data services. As a fourth source, Google Fi uses public Wi-Fi networks, including the Google Wi-Fi at Starbucks locations in this Judicial District, to provide its phone carrier service. The Google Wi-Fi at Starbucks locations in this Judicial District are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has contractual and/or property rights to use the Google Wi-Fi locations to operate its businesses, including the Google Fi phone carrier business.

35. Google determines whether a Google Fi customer in this Judicial District uses a certain Wi-Fi network, including the Google Wi-Fi networks at Starbucks locations, using the Google-provided SIM card and software on the customer's phone.

*Google's "Google Fi"*

36. As described above, Google owns, operates, and provides telecommunications infrastructure and service in this Judicial District through its own phone carrier network, Google Fi. Google provides cellular and Wi-Fi infrastructure and services for phone, messaging, and data services in this Judicial District. Google provides its customers voice and high-speed data coverage (4G LTE) for cities such as Tyler, Longview, and Marshall, Texas.




Source: https://fi.google.com/coverage?q=marshall%20tx.

37. The cell towers used for Google's services are fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google has contractual and/or property rights to use the cell towers to operate its business. Google also ratifies the service locations through its coverage lookup service.




Source: https://fi.google.com/about/coverage?pli=1

38. With this coverage lookup service, Google advertises its ability to provide cell coverage in this Judicial District and its selected cell towers in and near this Judicial District to provide the advertised coverage (*e.g.*, 2G, 3G, or 4G LTE, and 5G) depending on the location in the Judicial District. *See* https://fi.google.com/about/coverage/. Google is not indifferent to the location of its cell towers. It "established" and "ratified" them where they are for a specific business purpose.

39. Residents of this Judicial District also directly contract with and are billed by Google for these services.




Source: https://fi.google.com/about/plans?srsltid=AfmBOoq_ZoVxAIg_-ITSN7Mwq24yVzX2DYZ3i0IG3UwnC5bSdh03Cm2e

*Google Authorized Services In This Judicial District*

40. In addition to the Google presence described above, Google has other pervasive contracts in this Judicial District.

41. Google has multiple authorized repair centers in the Eastern District of Texas. A resident can visit Google's website to find a list of these repair centers:

## Find a repair partner

**Important:**

- **For walk-in service:**
  - Before you visit, call the repair partner to:
    - Confirm that the parts you need are available.
    - Get an estimate of the repair cost.
    - Schedule an appointment.
- **For mail-in service:** If there isn't an option available in your region, contact us.
  - You can use the table below to find and contact local repair partners directly.

- If you plan to use a walk-in service, first call the repair center to book an appointment and confirm parts availability.
- Mail-in and walk-in services vary by region. Use the table below to find an authorized repair partner in your region.

Choose your country: United States

| Country | Provider | Devices | Type of service | Repair type | Contact info |
|---|---|---|---|---|---|
| United States | Google | All Pixel phones | Mail-in and walk-in | In-warranty and out-of-warranty | Google Repair Center * |
| | | Pixel Tablet | Mail-in | Out-of-warranty | Google Repair Center |
| | Asurion or uBreakiFix | All Pixel phones | Mail-in and walk-in | Out-of-warranty | **Phone**: +1 877-320-2237 Asurion or uBreakiFix |
| | | Pixel 6 and later, including Fold | Mail-in and walk-in | In-warranty and out-of-warranty | |

In the US and Canada, you can replace parts or product service for all Pixel phones. This service is available for at least 3 years after Google stops production. The support comes from Google or providers that work with Google.

Source: https://support.google.com/store/answer/7182296?hl=en

42. Google's only authorized walk-in repair center, uBreakiFix by Asurion, lists at least four facilities in this Judicial District:




Source: https://www.ubreakifix.com/appointments/device-details?postal_code=75703&store=1022

43. uBreakiFix has fixed geographical locations. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. These stores are "of the defendant" because Google has contractual rights with uBreakiFix—the only authorized walk-in repair centers in the United States. Google also ratifies these facilities through its advertising of them through its website.

44. Google also has branded, mail-in repair service that is contracted with a company called KMT Wireless, LLC, d/b/a Cynergy Hitech. Cynergy Hitech receives phones at its facility in Grapevine, Texas.



PERSONAL TECH

**Contrary to its fine print, Google says it won't confiscate repair returns that have unapproved parts**

'We are updating our terms to clarify this' Pixel giant tells *The Reg*

Thomas Claburn 27

Published Tue 04 Jun 2024 // 19:22 UTC

Google has disavowed language in its terms'n'conditions that says the Pixel and Chromebook giant will confiscate devices sent in for repairs that contain unapproved parts.

The Chocolate Factory, in its Service & Repair Program fine print, advises customers not to send in "a device containing non-Google-authorized parts – if you do, your device will not be returned to you." Google's Service & Repair Program is administered by KMT Wireless, which does business under the name Cynergy.

Source: https://www.theregister.com/on-prem/2024/06/04/google-says-it-will-change-policy-on-keeping-repair-returns/1223010.

45. Google has operated and is currently operating its Google Maps Street View business and services in this Judicial District. For example, the image below shows the Google Maps Street View of the Eastern District of Texas courthouse in Marshall.




Source: https://www.google.com/maps/@32.5447145,-94.3670573,3a,75y,172.23h,86.8t/data=!3m7!1e1!3m5!1sFO30WdX6yFdsF-AETJiKew!2e0!6shttps:%2F%2Fstreetviewpixels-pa.googleapis.com%2Fv1%2Fthumbnail%3Fcb_client%3Dmaps_sv.tactile%26w%3D900%26h%3D600%26pitch%3D3.1961350719175528%26panoid%3DFO30WdX6yFdsF-AETJiKew%26yaw%3D172.23378944909376!7i16384!8i8192?entry=ttu&g_ep=EgoyMDI2MDgwNS4xIKXMDSoASAFQAw%3D%3D.

Furthermore, in the lower right-hand corner of the Google Street View above, the image is credited to Google and states that it was captured in October 2023 and 2026 copyright of Google.

46. Google also operates a Street View car in and around this Judicial District in order to provide the Google Maps Street View service.[25]

47. In addition to the above Google Street View image, Google operates and continues to operate a fleet of Google Street View vehicles in this Judicial District, including in the counties of Houston, Trinity, Polk, Angelina, Anderson, VanZandt, Denton, and Collin, as shown below.




Source: https://www.google.com/streetview/how-it-works/.

48. Google provides its Google Express business and services to the residents of this Judicial District by advertising and inviting the residents of this Judicial District, then Defendant arranges for a delivery company to bring the goods and products purchased through the Google Express website to the residents of this Judicial District.[26] This service uses fixed geographical stores in this Judicial District. They are "regular" and "established" because they operate in a

---

[25] *See* https://www.google.com/streetview/explore/.
[26] *See* https://support.google.com/express/answer/4561693?hl=en.

"steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google ratifies the stores (and selects products of the stores) through its website. Only information provided by Google through its service can be purchased, although the store may have other items for sale.

49. Google previously leased office space in this Judicial District for about 50 people through its Frisco, Texas office.

50. Google also provides services to businesses and schools in this Judicial District, including email services, word processing software, electronic file storage services, and video conferencing services. Google brands such services as "Education Fundamentals" services – formerly "G Suite for Education." Non-limiting examples of such businesses and schools include the Wylie High School, as shown below.

> How is Education Fundamentals different from G Suite for Education?
>
> Education Fundamentals is the new name for G Suite for Education. If your school is using G Suite for Education today, you don't have to take any action to transition to Education Fundamentals. All customers who have purchased G Suite Enterprise for Education will receive new features and functionality that are released to the new Google Workspace for Education editions. Your school's experience with our tools, as well as our qualifications for new customers to gain access to them, will remain the same.

Source: https://edu.google.com/intl/ALL_us/workspace-for-education/editions/overview/.

> **Q: Why Chromebooks?**
>
> **A:** Wylie ISD is a Google Workspace for Education district. This allows teachers and students to use Google's cloud based services such as Google Docs, Sheets, and Slides from any device in school or at home. We have already been using Chromebooks simultaneously with great success. They integrate completely with Google Workspace tools, are user friendly, and are at a price point that would allow WISD to move to a 1:1 environment. The Chromebook needs very little maintenance as most resources are accessed directly from the internet and updates are quick and automatic. Student work on the Chromebook automatically saves to the Google cloud and can be accessed from any device with an internet connection.

Source: https://whs.wylieisd.net/our-families/11-program.

51. Google also provides advertising services to businesses in this Judicial District, including soliciting reviews of patrons that have visited a business in the Eastern District of Texas, as shown below.




Source: Product Testing at https://www.google.com/search?q=restaurants+marshall+texas&sca_esv=5bc61aad9dddc238&rlz=1C1HKFL_enUS1214US1214&sxsrf=APpeQnuAqKy_M_U-PzT_MvJ1wIJDlY90xQ:1786402098386&udm=1&lsack=MlV6aq-XF9if5NoPpsSLuAg&sa=X&ved=2ahUKEwiv-P-zkpeWAxXYD1kFHSbiAocQjGp6BAgpEAA&biw=1536&bih=825&dpr=1.25

52. Google also allows businesses to use its "Merchant Center" to advertise and sell their products across various Google services and websites.




Source: https://www.google.com/retail/how-google-merchant-center-works/

53. Google's Merchant Center allows businesses that use one of Google's partner "e-commerce providers" (e.g., Shopify, PrestaShop, Woo, etc.) to link their online stores and sync the business' products to Google.

> **How do I add my products to Merchant Center?**
>
> If you use Shopify, WooCommerce, PrestaShop or another supported e-commerce platform, you can automatically add your products to Google when you link your e-commerce shop to your Merchant Center account. Any future changes that you make to products are automatically synced to Google.
>
> If you don't use a supported platform, Google can automatically add products from your website or you can manually add your product offerings via a file or spreadsheet, or by entering individual products.

Source: https://business.google.com/us/merchant-center/how-merchant-center-works/

54. Through Merchant Center, businesses can pay Google for "Performance Max", which uses Google AI to advertise products.

> **How do I promote my products on Google?**
>
> When you're ready, you can promote your products with Performance Max, our paid advertising campaigns that use Google AI to reach the right customers at the right time. You stay in full control of your budget and only pay when someone engages with your ad.

Source: https://business.google.com/us/merchant-center/how-merchant-center-works/

55. Google also monitors traffic conditions in this Judicial District. For example, traffic conditions between a McDonalds and the Federal Courthouse in Marshall, Texas as shown below.




Source: Product Testing at https://www.google.com/maps

56. Separate and apart from its Google Fi mobile service, Google also provides telephone services to residents in this Judicial District through a product it calls Google Voice.[27]




Source: https://voice.google.com/u/0/signup

[27] https://voice.google.com/u/0/signup.

57. Google provides Software-as-a-Service applications, including email and server space, to Texas public universities. Non-limiting examples of such universities are Texas A&M University (which has facilities in this Judicial District) and Texas A&M Commerce (located in this Judicial District), as shown below.




Source: http://google.tamu.edu/

> Welcome Lions to your new LeoMail 2.0 found in your myLEO homepage located at myLEO.tamu-commerce.edu.
> We hope you take some time to look through your new student email. As a reminder the new email is a gmail platform and share many features that a regular gmail account has.
>
> In addition to email, you will have the ability to build your own contacts list and use the built in calendar for planning and organizing.
> The most asked question has revolved around the ability to sync this email account with your mobile or smart phone device. The answer is ³yes². The Portal Implementation Team is working on getting both the email and your NEW myLEO account connected in an application that will be available in June.

Source: http://mailman.tamuc.edu/pipermail/students/2012-May/004325.html

58. Google currently engages NTT DATA Americas, Inc., whose North American operations include an office and headquarters presence at 7950 Legacy Drive in Plano, Texas, as a U.S. subprocessor providing Technical Support and Assured Support for all Google Cloud

Platform services and all Google Workspace Core and Cloud Identity services.

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NTT DATA Americas, Inc. | All Google Cloud Platform Services | All | Technical Support<br><br>Assured Support (US) | United States of America | 7950 Legacy Drive, Plano, Texas 75024 | United States of America | 04-2437166 | NTT DATA, Inc. |

Source: https://cloud.google.com/terms/subprocessors;
https://workspace.google.com/terms/subprocessors/;

59. In an October 2025 announcement issued from Plano, NTT DATA stated that Texas is its North American headquarters and that it had been selected to manage the State of Texas' public-cloud estate, including Google Cloud, while orchestrating the State's strategic relationship with Google.[28]

60. NTT DATA's Plano-based U.S. organization is currently recruiting an expressly Google-dedicated "Google Workspace Stack Director" to lead Google Workspace services and delivery.[29]

61. The City of Frisco identifies Wing Aviation as a "Google sister company" and states that Wing expanded its commercial drone-delivery operations in Frisco on September 24, 2025, including a new launch site at 355 Stonebrook Parkway.[30]

62. Plano-based Covasant announced in April 2026 that it was partnering directly with Google Cloud to deploy and expand enterprise use of Gemini Enterprise, with the collaboration confirmed by Google's vice president for Global System Integrator Partnerships.[31]

---

[28] *See* https://www.nttdata.com/en-us/news/2025/ntt-data-selected-to-empower-public-cloud-services-for-the-state-of-texas.
[29] *See* https://careers-inc.nttdata.com/job/Plano-Google-Workspace-Stack-Director-TX/1365499100/.
[30] *See* https://www.friscotexas.gov/1755/Wing-Drone-Delivery.
[31] *See* https://www.covasant.com/newsroom/covasant-google-cloud-gemini-enterprise.

63. The University of North Texas currently identifies Google Cloud as one of the corporate and academic partners supporting its business-analytics programs in Denton.[32]

64. UT Tyler currently provides students with access to numerous Google Professional Certificates through its Coursera Career Academy, including Google certificates in cybersecurity, IT support, project management, digital marketing, and data analytics.[33]

65. Google further sells goods, such as smartphones, smartwatches, fitness tracking devices, tablets, television streamlining devices, smart-home devices, and more at various retailers throughout the Eastern District of Texas. For example, there are multiple Best Buy locations in this District where Google products are sold directly to customers, including at least: 823 North Creek Drive, Sherman, Texas 75092 (Grayson County), 2800 North Central Expressway, Plano, Texas 75074 (Collin County); 1751 North Central Expressway, Suite C, McKinney, Texas 75070 (Collin County); 3333 Preston Road, Suite 200, Frisco, Texas 75034 (Denton County); 5299 Eldorado Parkway, Frisco, Texas 75033 (Denton County); 1800 South Loop 288, Suite 102 Building 1; Denton, Texas 76205 (Denton County); 6060 Long Prairie Road, Suite 500, Flower Mound, Texas 75028 (Denton County); 2601 South Stemmons Freeway, Suite 300, Lewisville, Texas 75067 (Denton County); 5885 East Freeway, Beaumont, Texas 77706 (Jefferson County); 8725 Memorial Boulevard, Port Arthur, Texas 77640 (Jefferson County); 869 NE Mall Boulevard, Hurst, Texas 76053 (Shelby County); 422 West Loop 281, Suite 100, Longview, Texas 75605 (Gregg County); 4210 Saint Michael Drive, Texarkana, Texas 75503 (Bowie County); 5514 South Broadway Avenue, Tyler, Texas 75703 (Smith County). [34]

---

[32] *See* https://www.unt.edu/academics/programs/business-analytics-masters.html.
[33] *See* https://www.uttyler.edu/offices/digital-learning/microcredentials/.
[34] https://stores.bestbuy.com/tx/sherman/823-n-creek-dr-1023.html#shop;
https://stores.bestbuy.com/tx/plano/2800-n-central-expy-202.html;
https://stores.bestbuy.com/tx/frisco/3333-preston-rd-180.html;

66. Upon information and belief, Google enters contractual agreements with Best Buy and other retailers to exclusively display and sell Google products. Google exerts control over these sections of the retailers by dictating what products must be displayed, how the displays must look, how Google signage must be displayed, among other things. Upon further information and belief, Google further requires retailers, such as Best Buy, to staff employees trained to use and demonstrate the use of Google products. These retailers represent fixed geographical stores in this Judicial District. They are "regular" and "established" because they operate in a "steady, uniform, orderly, and methodical manner" and are sufficiently permanent. They are "of the defendant" because Google ratifies the stores by requiring only Google products to be sold in designated areas, controlling what products are displayed, and mandating what Google signage can be displayed at these locations.

67. Google sells products at other brick-and-mortar retailers in this District, including, but not limited to, Costco, Target, Walmart, Verizon, AT&T, and T-Mobile.

*Other Google Presence in the State*

68. Google also has a pervasive connection to the State of Texas through multiple commercial activities.

---

https://stores.bestbuy.com/tx/frisco/5299-eldorado-pkwy-1773.html;
https://stores.bestbuy.com/tx/beaumont/5885-eastex-fwy-238.html;
https://stores.bestbuy.com/tx/denton/1800-s-loop-288-827.html;
https://stores.bestbuy.com/tx/flower-mound/6060-long-prairie-rd-1038.html;
https://stores.bestbuy.com/tx/lewisville/2601-s-stemmons-fwy-258.html;
https://stores.bestbuy.com/tx/longview/422-w-loop-281-594.html;
https://stores.bestbuy.com/tx/mckinney/1751-n-central-expy-196.html;
https://stores.bestbuy.com/tx/port-arthur/8725-memorial-blvd-1545.html;
https://stores.bestbuy.com/tx/texarkana/4210-saint-michael-dr-605.html;
https://stores.bestbuy.com/tx/tyler/5514-s-broadway-ave-246.html

69. Google purchased land in Midlothian, Texas, to construct a $600 million data center.[35] Google also invested an additional $100 million to build a second data center in Midlothian, Texas.[36] Google is currently investing in the construction of a new data center in Wilbarger County, Texas, and plans to invest at least "$40 billion in Texas through 2027 for cloud and AI infrastructure. Other new data centers are planned for Armstrong and Haskell counties in Texas."[37]

70. Since 2007, Google has employed "hundreds" of employees in Texas, including in Austin, Texas.[38]

71. As of at least October 2024, Google leased a 1.1 million-square-foot warehouse in west, Fort Worth, Texas. Upon information and belief, Googe intends to use this warehouse to expand its cloud and data center infrastructure.[39] This new data center is part of Google's pledge to invest $1 billion in Texas in 2024.[40]

72. Google has at least one current office located in Austin, on North MoPac Expressway,[41] and additional office locations at University Park and Austin Children's Museum.[42]

---

[35] *See* https://www.dallasnews.com/business/real-estate/2019/06/14/google-s-massive-600m-data-center-takes-shape-in-ellis-county-as-tech-giant-ups-texas-presence/.
[36] *See* https://www.datacenterdynamics.com/en/news/google-files-to-build-fourth-data-center-at-midlothian-campus-in-texas/.
[37] https://www.crn.com/news/cloud/2026/google-unveils-two-new-us-data-centers-as-185-billion-commitment-gets-underway; *see also* https://storage.googleapis.com/gweb-uniblog-publish-prod/documents/wilbarger_county_PR.pdf.
[38] According to Gerardo Interiano, Google's public affairs and government relations manager, in a statement. *See* http://www.statesman.com/business/google-lease-200-000-square-feet-newdowntown-austin-tower/SANZSa3du8QQ4k8ytOC2rJ/.
[39] *See* https://www.mysanantonio.com/business/article/google-texas-warehouse-19830090.php.
[40] https://www.wfaa.com/article/news/local/google-texas-investment-plans-data-centers/287-40ef130e-b944-4c9f-8622-1b87503d1dbc.
[41] *See* https://www.google.com/intl/en/about/locations/?region=north-america.
[42] *See* http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtownaustin-tower/SANZSa3du8QQ4k8ytOC2rJ/.

73. Google has leased over 200,000 square feet of office space in Austin, Texas at 500 West 2nd Street.[43]

74. Google has, as of August 2026, full-time job postings for Austin, Addison, Dallas, Midlothian, Haskell, Wichita Falls, and Amarillo, Texas (234 postings)[44] including positions such as:

- Program Manager, Data Center Construction (Amarillo, TX);
- Third-Party Data Center Operations Manager (Amarillo, TX);
- Application Engineer (Austin, Texas);
- Senior Data Engineer, Trust and Safety, Tech and Data Enablement (Austin, Texas);
- Software Engineer III, Embedded Systems/Firmware, Platforms Infrastructure Engineering (Austin, Texas);
- Software Engineer III, AI/ML Machine Learning, Core (Austin, Texas); and
- Launch Manager, Google Play Trust and Safety (Austin, Texas);

75. Upon information and belief, Defendant has at least eleven (11) entitled registered companies in Texas, including:

- GOOGLE LLC
- GOOGLE ACQUISITION HOLDING, INC.
- GOOGLE COMPARE AUTO INSURANCE SERVICES INC.
- GOOGLE COMPARE CREDIT CARDS INC.

---

[43] *See* http://www.statesman.com/business/google-lease-200-000-square-feet-new-downtownaustin-tower/SANZSa3du8QQ4k8ytOC2rJ/.

[44] *See* https://www.google.com/about/careers/applications/jobs/results?company=Google&location=Texas%2C%20USA.

- GOOGLE COMPARE MORTGAGES INC.
- GOOGLE FIBER INC.
- GOOGLE FIBER NORTH AMERICA INC.
- GOOGLE FIBER TEXAS, LLC
- GOOGLE INC.
- GOOGLE NORTH AMERICA INC.
- GOOGLE PAYMENT CORP.

76. Google has provided, currently provides, and is currently offering to provide its Google Fiber services to the residents of Austin, Texas, and San Antonio, Texas.[45]

77. Google has invested $200 million in the Spinning Spur Wind Farm Project in Oldham County, Texas.[46]

78. Google acquired Waze in 2013,[47] and Google's Waze traffic app partners with cities and businesses in Texas, non-limiting examples of which include the Waze partnership with the City of Fort Worth to provide constant traffic data to the city.[48] Another non-limiting example includes the Waze partnership with the Genesis Group in Tyler to decrease emergency response times.[49] Another non-limiting example is the pilot use of TrainFo sensors in Fort Worth that feed information to Waze and Google to provide traffic data.[50]

---

[45] *See* https://fiber.google.com/cities/austin/ and https://fiber.google.com/cities/sanantonio/.
[46] *See* https://venturebeat.com/business/googles-tosses-200m-at-spinning-spur-wind-project-to-bring-its-green-power-to-2-gigawatts/.
[47] *See* https://techcrunch.com/2013/06/11/its-official-google-buys-waze-giving-a-social-data-boost-to-its-location-and-mapping-business/.
[48] *See* https://dallasinnovates.com/fort-worth-waze-partner-ease-traffic-woes/.
[49] *See* https://genesisworld.com/the-genesis-group-joins-waze-connected-citizens-program/.
[50] *See* https://citizenportal.ai/articles/9029143/Texas/Tarrant-County/Fort-Worth/Fort-Worth-to-pilot-TrainFo-sensors-tie-crossing-data-into-Waze-and-CAD.

79. This Court has previously found that Google maintains a regular and established place of business in this Judicial District. *See AGIS Software Dev. LLC v. Google LLC*, Case No. 2:19-CV-00361-JRG, Dkt. 378 (E.D. Tex.). Further, on information and belief, Google either admitted to or not contested venue in this jurisdiction in previous patent disputes. *See Advanced Coding Technologies LLC v. Google LLC*, Case No. 2:24-cv-00353 (E.D. Tex.).

**PATENTS-IN-SUIT**

80. On February 3, 2015, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,949,879 (the "'879 Patent") entitled "Access Controls for Known Content." A true and correct copy of the '879 Patent is available at: https://patentimages.storage.googleapis.com/cf/7c/9f/1a370fc15f9104/US8949879.pdf.

81. On November 25, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,898,803 (the "'803 Patent") entitled "Content and Identity Delivery System for Portable Playback of Content and Streaming Service Integration". A true and correct copy of the '803 Patent is available at: https://patentimages.storage.googleapis.com/f4/3a/65/e122d49133de59/US8898803.pdf.

82. On March 14, 2017, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 9,595,300 (the "'300 Patent") entitled "Contextual Chapter Navigation." A true and correct copy of the '300 Patent is available at: https://patentimages.storage.googleapis.com/b2/e4/a7/76a598cb2aed44/US9595300.pdf.

83. On June 3, 2014, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 8,745,749 (the "'749 Patent") entitled "Virtual Secure Digital Card." A true and correct copy of the '749 Patent is available at: https://patentimages.storage.googleapis.com/64/49/99/11947952f342e0/US8745749.pdf.

84. Truesight is the sole and exclusive owner of all right, title, and interest in the'879 Patent, the '803 Patent, the '300 Patent, and the '749 Patent, (collectively, the "Patents-in-Suit"), and holds the exclusive right to take all actions necessary to enforce its rights to the Patents-in-Suit, including the filing of this patent infringement lawsuit. Truesight also has the right to recover all damages for past, present, and future infringement of the Patents-in-Suit and to seek injunctive relief as appropriate under the law.

## FACTUAL ALLEGATIONS

85. The Patents-in-Suit generally relate to methods and apparatuses related to storage and display of digital media.

86. The '879 Patent relates to technology involving personalized access controls associated with digital media in a digital library by creating policy decisions regarding use of the asset based on these settings. The access controls can be implemented on an individual or on a group basis. The technology described in the '879 Patent was developed by Joseph Zipperer, Steven King, and Valiant Seu. For example, the technology is implemented in infringing Google smartphones, including, but not limited to, the Google Pixel 11, using software and/or applications, such as Google Family Link, to put content restrictions on certain media, such as television shows and movies.

87. The '803 Patent relates to technology for downloading streamed digital media from a device to a media storage system for when the device is not connected to a network. The technology described in the '803 Patent was developed by David W. Hostetter and Joseph P. Zipperer. For example, the technology is implemented in Google smartphones and other mobile devices including, but not limited to, the Google Pixel 11, when videos are downloaded to the device's virtual and/or flash memory, such as an SD card or equivalent internal storage.

88. The ’300 Patent relates to technology for systems and methods for chapter navigation of video playbacks along a timeline of the video. The technology described in the ’300 Patent was developed by Todd E. Duffin, Todd R. Malsbary, and Mark E. Phillips. For example, the technology is implemented in Google smartphones which stream videos that allow for chapter navigation and selection within the video, including, but not limited to, the Google Pixel 11.

89. The ’749 Patent relates to technology for systems and methods for generating virtual memory. The technology was developed by Joseph P. Zipperer and John Calixto. For example, the technology is implemented in Google smartphones and other mobile devices through Google memory modules, including, but not limited to, the Zoned UFS module.

90. Google has infringed and is continuing to infringe the Patents-in-Suit by making, using, selling, offering to sell, and/or importing, and by actively inducing others to make, use, sell, offer to sell, and/or importing, products including, but not limited, to smartphones and tablets.

**COUNT I**
**(Infringement of the ’879 Patent)**

91. Paragraphs 1 through 90 are incorporated by reference as if fully set forth herein.

92. Truesight has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the ’879 Patent.

93. Defendant has and continues to directly infringe the ’879 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the ’879 Patent. Such infringing products include Google smartphones, including, but not limited to, the Google Pixel 11, among other Google products.

94. For example, Defendant has and continues to directly infringe at least Claim 4 of

the ’879 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include Google smartphones, including, but not limited to, the Google Pixel 11, among other Google Products, through the implementation of content restrictions, such as those through Google Family Link and other parental controls. The Google Pixel 11 is exemplary of how the Accused Products infringe the ’879 Patent.

95. The Google Pixel 11, through the use of Google Family Link, performs a method in a computing system for creating specific rating policies for digital media access, the method comprising: under control of the computing system having a memory and a processor. For example, the Google Family Link allows users to set ratings (e.g., Teen, PG-13, PG-14) for known digital content (e.g., Apps, Games, Movies, TV) to be played back on a video playback device having a V-chip or the equivalent thereof.

96. The Google Pixel 11, through the use of Google Family Link, performs a step of retrieving media information from the memory comprising a rating based media access policy for a digital content; displaying the rating based media access policy to a user. For example, the Google Family Link comprises a rating policy management module (e.g., Content Restrictions) for selectively setting rating based access control on a per media (e.g., Apps, Games, Movies, TV, books) and per user basis for digital content of a digital library (e.g., Google Play library) thereby displaying the rating based media access policy to a user (e.g., a parent).

97. The Google Pixel 11, through the use of Google Family Link, performs a step of receiving from the user a first rating based access control policy override action for a first viewer and a second, different, rating based access control policy override action for a second viewer with respect to a same specific digital content. For example, Google Family Link performs the step of receiving from the user (e.g., a parent) a first rating based access control policy (e.g., PG-13

Movies for a 14-year-old) override action for a first viewer and a second, different, rating based access control policy override (e.g., G Movies for a 7-year-old) action for a second viewer with respect to a same specific digital content (e.g., a PG-13 rated movie).

98. The Google Pixel 11, through the use of Google Family Link, performs a step wherein the first viewer and second viewer are separate and distinct from the user from which the override actions are received, and wherein the first viewer is associated with a first authentication code unique to the first viewer and the second viewer is associated with a second authentication code unique to the second viewer. For example, a first user (e.g., a 14-year-old) and a second user (e.g., a 7-year-old) are separate and distinct from the user (e.g., a parent) from which the override actions are received, and wherein the first viewer is associated with a first authentication code unique to the first viewer (e.g. the 14-year-old's login) and the second viewer is associated with a second authentication code unique to the second viewer (e.g., the 7-year-old's login);

99. The Google Pixel 11, through the use of applications such as Google Family Link, performs a step of storing the first and second policy override actions in a rating policy repository wherein future playback of the digital content is allowed or blocked consistent with the stored policy override action. For example, Google Family Link stores the first policy override action (e.g., access to PG-13 movies for a 14-year-old) and second policy override actions (e.g., no access to PG-13 movies for a 7-year-old) in a rating policy repository wherein future playback of the digital content (e.g., a PG-13 rated movie) is allowed or blocked consistent with the stored policy override action.

100. The Google Pixel 11, through the use of applications such as Google Family Link, performs a step wherein the first viewer is allowed to access the specific digital content based upon the first authentication code and the second viewer is blocked from access to the specific digital

content based upon the second authentication code, wherein the first authentication code comprises a personal identification number (PIN). For example, the first user (e.g., a 14-year-old) is required to use their Google login to see available content (e.g., a PG-13 movie), while the second viewer (e.g., a 7-year-old) is blocked from accessing the specific digital content based upon the authentication code (e.g., the 7-year-old's login), wherein the first authentication code comprises a personal identification number (PIN).

101. The Google Pixel 11, through the use of applications such as Google Family Link, performs a step wherein the first of the two users is allowed to access the specific digital content in response to determining that a content identifier of the specific digital content matches a user identifier of the first user and the personal identification number of the first user is successfully authenticated. For example, the first of the two users (e.g., a 14-year-old) is allowed to access the specific digital content (e.g., a PG-13 movie) in response to determining that a content identifier of the specific digital content identifier (e.g., Family Link inclusion of a PG-13 or lower movie) matches a user identifier of the first user (e.g., a 14-year-old's username) and the personal identification number of the first user is successfully authenticated (e.g., a 14-year-old's successful login with password).

102. On information and belief, Defendant's direct infringement of the '879 Patent includes, but is not limited to, testing, development, troubleshooting, and other use in the United States. Defendant also uses the Accused Products at tradeshows in the United States to promote the sale of the Accused Products.

103. Defendant has and continues to indirectly infringe one or more claims of the '879 Patent by knowingly and intentionally inducing others, including Google's customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using,

offering to sell, selling and/or importing into the United States products that include infringing technology.

104. Defendant, with knowledge[51] that these products, or the use thereof, infringe the ’879 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the ’879 Patent by providing these products to end users for use in an infringing manner. Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, and instructing its officers, agents, and employees to not review the patents of others, including specifically those related to Defendant’s specific industry, with the subject belief that there was a high probability that Defendant would learn of its infringing activities, thereby remaining willfully blind to the ’879 Patent at least as early as the issuance of the ’879 Patent.

105. Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the ’879 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant’s website, product literature and packaging, and other publications. For

[51] On information and belief, Google gained knowledge of the ’879 Patent on or about December 29, 2023, with the filing of a complaint for patent infringement in *Truesight Communications LLC v. Samsung Electronics Co., Ltd., et al.*, Case No. 2:23-cv-00643, Dkt. 1 (E.D. Tex. Dec. 29, 2023), which accused Google’s Family Link Application and other parental controls of infringing the ’879 Patent. Google was also subpoenaed in relation to this case and provided discovery related to several of the accused functionalities. Alternatively, Google gained knowledge of the ’879 Patent between December 20, 2023, and December 17, 2024, when Google filed a petition for *inter partes* review of the ’879 Patent. *See Google LLC v. Truesight Communications LLC*, IPR2025-00025, Paper 1 (P.T.A.B. Dec. 17, 2024).

example, Google makes available to its customers and end-users various materials that instruct them on how to use Google's products in an infringing manner based on the product, such as user manuals.[52]

106. On information and belief, these instructional materials are prepared by Defendant or at the direction of Defendant. Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and directly infringe the '879 Patent. Defendant performs these affirmative acts with knowledge of the '879 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '879 Patent.

107. Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '879 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '879 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '879 Patent , have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '879 Patent. Defendant performs these affirmative acts with knowledge of the '879 Patent and with intent, or willful blindness, that they cause the direct infringement of the '879 Patent.

108. Truesight has suffered damages as a result of Defendant's direct and indirect infringement of the '879 Patent in an amount to be proven at trial.

---

[52] For example, user instructions and assistance are available through the preinstalled My Pixel Application.

109. Truesight has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '879 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

**COUNT II**
**(Infringement of the '803 Patent)**

110. Paragraphs 1 through 90 are incorporated by reference as if fully set forth herein.

111. Truesight has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '803 Patent.

112. Defendant has and continues to directly infringe the '803 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '803 Patent. Such products include smartphones such as the Google Pixel 11 preloaded with streaming applications, such as the Google TV, among other Googleproducts.

113. For example, Defendant has and continues to directly infringe at least Claim 1 of the '803 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include Google smartphones, such as the Google Pixel 11 preloaded with the Google TV, among other Google products. The Google Pixel 11 is exemplary of how the Accused Products infringe the '803 Patent.

114. The Google Pixel 11, integrated with Google TV, performs a method of delivering content by integrating a kiosk delivery system with a streaming service (e.g., Google TV). The Google Pixel 11, integrated with Google TV, performs a step of transferring content from a kiosk to a flash memory media device, wherein the flash memory media device is configured to be connected to a playback device. For example, the streaming content from Google TV can be

downloaded and saved on the smartphone's SD card or equivalent internal storage.

115. The Google Pixel 11, integrated with Google TV, performs a step of transferring user service information, including user account information for one or more account based digital content streaming services, from the kiosk to the flash memory media device. For example, Google TV stores user credentials information such as username and password on the user device memory. This memory can be the internal or external memory of the device.

116. The Google Pixel 11, integrated with Google TV, performs a step wherein, responsive to the flash memory media device being connected to the playback device: if the playback device is connected to a network via a network connection having a speed that meets a threshold for streaming digital content, the transferred user service information from the connected flash memory media device is used to access at least one of the one or more account based digital streaming services to stream a higher quality version of the content to the connected playback device for playback, wherein the higher quality version of the content is a high definition version of standard definition content transferred from the kiosk to the flash memory media device. For example, Contents can be downloaded from Google TV and stored in SD cards or equivalent internal storage and can be viewed later, even in the absence of a network (internet). Google TV accesses stored user information such as username and password to streamline online content at an HD quality when the device is connected to the internet and has a certain internet connection speed (e.g., threshold).

117. The Google Pixel 11, integrated with Google TV, performs a step wherein, responsive to the flash memory media device being connected to the playback device: otherwise, the content stored on the connected flash memory media device is used for playback of the content.

For example, Google TV allows the user to watch movies downloaded on the device's SD memory card or equivalent internal storage when there is no internet connection.

118. On information and belief, Defendant's direct infringement of the '803 Patent includes, but is not limited to, testing, development, troubleshooting, and other use in the United States. Defendant also uses the Accused Products at tradeshows in the United States to promote the sale of the Accused Products.

119. Defendant has and continues to indirectly infringe one or more claims of the '803 Patent by knowingly and intentionally inducing others, including Google's customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

120. Defendant, with knowledge[53] that these products, or the use thereof, infringe the '803 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '803 Patent by providing these products to end users for use in an infringing manner. Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, and instructing its officers, agents, and employees to not review the patents of others, including specifically those related to Defendant's specific industry, with the subject belief that there was a

[53] On information and belief, Google gained knowledge of the '803 Patent on or about December 29, 2023, with the filing of a complaint for patent infringement in *Truesight Communications LLC v. Samsung Electronics Co., Ltd., et al.*, Case No. 2:23-cv-00643, Dkt. 1 (E.D. Tex. Dec. 29, 2023), which accused Android-based devices of infringing the '803 Patent. Google was also subpoenaed in relation to this case and provided discovery related to several of the accused functionalities.

high probability that Defendant would learn of their infringing activities, thereby remaining willfully blind to the ’803 Patent at least as early as the issuance of the ’803 Patent.

121.

Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the ’803 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant’s website, product literature and packaging, and other publications. For example, Google makes available to its customers and end-users various materials that instruct them on how to use Google products in an infringing manner based on the product, such as user manuals. [54]

122. On information and belief, these instructional materials are prepared by Defendant or at the direction of Defendant. Because of Defendant’s inducement, Defendant’s customers and end-users use the Accused Products in a way Defendant intends and directly infringe the ’803 Patent. Defendant performs these affirmative acts with knowledge of the ’803 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’803 Patent.

123. Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the ’803 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States.

---

[54] For example, user instructions and assistance are available through the preinstalled My Pixel Application.

Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '803 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '803 Patent, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '803 Patent. Defendant performs these affirmative acts with knowledge of the '803 Patent and with intent, or willful blindness, that they cause the direct infringement of the '803 Patent.

124. Truesight has suffered damages as a result of Defendant's direct and indirect infringement of the '803 Patent in an amount to be proven at trial.

125. Truesight has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '803 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

**COUNT III**
**(Infringement of the '300 Patent)**

126. Paragraphs 1 through 90 are incorporated by reference as if fully set forth herein.

127. Truesight has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '300 Patent.

128. Defendant has and continues to directly infringe the '300 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '300 Patent. Such products include Google smartphones including, but not limited to, the Google Pixel 11, among other Google products.

129. For example, Defendant has and continues to directly infringe at least Claim 1 of

the '300 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include smartphone including, but not limited to, the Google Pixel 11, which includes the YouTube Mobile Application as part of the Google Mobile Services ("GMS")[55], among other Google products.

130. The Google Pixel 11, through the YouTube Mobile Application, performs a method for navigating a plurality of chapters of video content within a video. YouTube openly promotes its chapter navigation functionality and offers advice to users on how to incorporate said functionality in their videos. YouTube also added the chapter navigation functionality to its Mobile Application, which comes pre-downloaded on most Android phones.

131. The Google Pixel 11, through the YouTube Mobile Application, performs a method of reading from a metadata file stored with the video chapter start times, and location on a secure digital card (SD card) of chapter preview images that correspond to the playable content as initially configured and stored on the secure digital card, each chapter comprising a segment of content of the video. For example, when a user selects to watch certain YouTube videos on the Android app, users will have access to a chapter navigation functionality. The entirety of the YouTube video will be broken up into several chapters, each with a title and a preview image. The chapters will be displayed on the video timeline, in a list format, and in sequence with preview images of each chapter and the time corresponding to each chapter:

[55] *See* https://www.android.com/gms/.


3:32
0:20 / 14:12 · Sunrise ›
Nic Ansuini
NASA
Description
4.5K
Likes
118,919
Views
Dec 16
2022
Ship 24 tested its flaps, Booster 9 rolled out to the launch site for cryo testing with an all new design, and the Ship QD arm was retracted and extended back in place.
Ship 24 Static Fire - https://youtu.be/bRmhHsAhrSQ
Video and Pictures from Nic (@nicansuini), Nor ...more
Chapters
VIEW ALL
Sunrise
0:00
Ship 24 Flap Test
0:30
The Same Test From a Different Angle
1:04
Ship QD Arr Moven
1:41



[56]

132. The Google Pixel 11, through the YouTube Mobile Application, performs a method of presenting, during continuous playback of a video, an on-screen display to a user, the on-screen display including a timeline having a demarcation for the beginning of each of the plurality of chapters of the video and having a marker corresponding to a current position in the video playback, the timeline assembled from the chapter titles, the chapter start times, and the location on the secure digital card of chapter preview images that correspond to the playable content stored as part of the metadata, and the on-screen display including one image for each of the plurality of

[56] *See* https://www.youtube.com/watch?v=Sri2Y2sToPY, viewed on an Android device.

chapters from the chapter preview images displayed in sequential order parallel to the timeline, wherein a focus identifier marks an image of a chapter corresponding to the current position within the continuous video playback. For example, during continuous playback of a video on the YouTube Mobile Application, a user can access several on-screen displays of the video's timeline. A first timeline is displayed as a red-and-gray bar at the bottom of the video, which displays the timeline of the entire video in sections. The red portions of the bar designate portions of the video that have already played, while the gray sections indicate sections of the video that have yet to play but have buffered. At least two other timelines are viewable in the video's description. A second timeline has a preview image for each chapter, along with the chapter's start time and its name. When the video is playing a particular chapter, the section of this timeline with the corresponding chapter preview image will be highlighted in a light-gray color. The focus identifier (e.g., a small, red dot on the video bar) is located in the corresponding chapter currently playing while the preview image in the video's description is highlighted. A third timeline – also available in the video's description – is a vertical list of the chapters' start times and names.

133. The Google Pixel 11, through the YouTube Mobile Application, performs a method of receiving a selection of one of the chapter preview images as chapter skip input during the continuous playback of the video. For example, during continuous playback of a video on YouTube's Mobile Application, a user can skip forward or backward in the video by selecting a chapter in one of the video timelines that has corresponding chapter preview images (e.g., skipping from Chapter "Sunrise" to Chapter "The Same Test From A Different Angle", as shown below):



[57]

134. The Google Pixel 11, through the YouTube Mobile Application, performs a method of moving the at least one image from each chapter one position along the line with respect to the focus identifier, according to the chapter skip input, wherein the one image is moved to the left when the chapter skip input indicates a skip forward and wherein the one image is moved to the right when the chapter skip input indicates a skip backward. For example, a user on the YouTube

[57] *See* https://www.youtube.com/watch?v=Sri2Y2sToPY, viewed on an Android device.

Mobile Application can select to skip forward or backward in a video by clicking on one of the preview images in the chapter timeline, where the preview image corresponds to the chapter to which the user is skipping. If the user clicks on an image to the right of the chapter currently playing on the chapter timeline, the video skips forward. Alternatively, if the user clicks on an image to the left of the image of the chapter currently playing on the chapter timeline, the video skips backwards. The focus identifier (e.g., the red dot on the video playback in the figure above) moves accordingly. In response to skipping forward in the video, the selected video chapter preview image is oriented in the center of the chapter timeline and is highlighted in a light-gray color:





[58]

135. The Google Pixel 11, through the YouTube Mobile Application, performs a method of skipping playback of the video to a chapter identified by the focus identifier such that the video playback continues from the position of the chapter identified by the focus identifier. For example, a user using the YouTube Mobile Application can also skip chapters by moving the focus identifier (e.g., the red dot on the video playback) to the right or to the left (e.g., forward or backward in the video, respectively). The focus identifier's position corresponds to the chapter currently playing in the video.

[58] *See* https://www.youtube.com/watch?v=Sri2Y2sToPY, viewed on an Android device.

136. On information and belief, Defendant's direct infringement of the '300 Patent includes, but is not limited to, testing, development, troubleshooting, and other use in the United States. Defendant also uses the Accused Products at tradeshows in the United States to promote the sale of the Accused Products.

137. Defendant has and continues to indirectly infringe one or more claims of the '300 Patent by knowingly and intentionally inducing others, including Google's customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

138. Defendant, with knowledge[59] that these products, or the use thereof, infringe the '300 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the '300 Patent by providing these products to end users for use in an infringing manner. Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, and instructing its officers, agents, and employees to not review the patents of others, including specifically those related to Defendant's specific industry, with the subject belief that there was a

[59] On information and belief, Google gained knowledge of the '300 Patent through citation to the '300 Patent family in relation to Google's own U.S. patent application, which was filed as U.S. Patent App. 13/558,521 on July 26, 2012, and was issued as U.S. Patent No. 9,110,562 on August 18, 2015. *See* https://patents.google.com/patent/US9595300B2/en?oq=9595300#citedBy. Alternatively, Google gained knowledge of the '300 Patent on or about December 29, 2023, with the filing of a complaint for patent infringement in *Truesight Communications LLC v. Samsung Electronics Co., Ltd., et al.*, Case No. 2:23-cv-00643, Dkt. 1 (E.D. Tex. Dec. 29, 2023), which accused Google's YouTube Application of infringing the '300 Patent. Google was also subpoenaed in relation to this case and provided discovery related to several of the accused functionalities. Alternatively, Google gained knowledge of the '300 Patent between December 20, 2023, and December 17, 2024, when Google filed a petition for *inter partes* review of the '300 Patent. *See Google LLC v. Truesight Communications LLC*, IPR2025-00024, Paper 1 (P.T.A.B. Dec. 17, 2024).

high probability that Defendant would learn of their infringing activities, thereby remaining willfully blind to the ’300 Patent at least as early as the issuance of the ’300 Patent.

139.

Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the ’300 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant’s website, product literature and packaging, and other publications. For example, Google makes available to its customers and end-users various materials that instruct them on how to use Google products in an infringing manner based on the product, such as user manuals. [60]

140. On information and belief, these instructional materials are prepared by Defendant or at the direction of Defendant. Because of Defendant’s inducement, Defendant’s customers and end-users use the Accused Products in a way Defendant intends and directly infringe the ’300 Patent. Defendant performs these affirmative acts with knowledge of the ’300 Patent and with the intent, or willful blindness, that the induced acts directly infringe the ’300 Patent.

141. Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the ’300 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States.

[60] For example, user instructions and assistance are available through the preinstalled My Pixel Application.

Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '300 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '300 Patent, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '300 Patent. Defendant performs these affirmative acts with knowledge of the '300 Patent and with intent, or willful blindness, that they cause the direct infringement of the '300 Patent.

142. Truesight has suffered damages as a result of Defendant's direct and indirect infringement of the '300 Patent in an amount to be proven at trial.

143. Truesight has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '300 Patent, for which there is no adequate remedy at law, unless Defendant's infringement is enjoined by this Court.

**COUNT IV**
**(Infringement of the '749 Patent)**

144. Paragraphs 1 through 90 are incorporated by reference as if fully set forth herein.

145. Truesight has not licensed or otherwise authorized Defendant to make, use, offer for sale, sell, or import any products that embody the inventions of the '749 Patent.

146. Defendant has and continues to directly infringe the '749 Patent, either literally or under the doctrine of equivalents, without authority and in violation of 35 U.S.C. § 271, by making, using, offering to sell, selling, and/or importing into the United States products that satisfy each and every limitation of one or more claims of the '749 Patent. Such products include Google smartphones including, but not limited to, the Google Pixel 11, among other Google products.

147. For example, Defendant has and continues to directly infringe at least Claim 1 of

the ’749 Patent by making, using, offering to sell, selling, and/or importing into the United States products that include Google smartphones including, but not limited to, the Google Pixel 11, among other Google products. The Google Pixel 11 is exemplary of how the Accused Products infringe the ’749 Patent.

148. The Google Pixel 11, equipped with a Zoned UFS module, performs a method for generating a virtual secure digital (SD card).


Memory and storage
256 GB / 12 GB RAM[9]
512 GB with Zoned UFS for faster performance / 12 GB RAM[10]

[61]

149. The Google Pixel 11, equipped with a Zoned UFS module, performs a step of reading a media key block and media identification for an SD card. For example, during configuration of secure storage, media keys and media identification are loaded and read. By way of further example, when a video is loaded into memory on a Google device, a Digital Rights Management (“DRM”) module loads and reads media keys as well as media identification and metadata related to DRM.

150. The Google Pixel 11, equipped with a Zoned UFS module, performs a step of storing the media key block and the media identification. For example, prior to playback, the Google Pixel 11 stores media key blocks and media identification. This information can be stored on the Zoned UFS module.

151. The Google Pixel 11, equipped with a Zoned UFS module, performs a step of creating a file system for secure data on a storage device for storage of secure data corresponding to a secure data area of the SD card. For example, the Google Pixel 11 creates file systems for

[61] *See* https://store.google.com/product/pixel_11_specs?hl=en-US.

secure storage (e.g., a "Secure File System") on a storage device (e.g., on eMMC and/or UFS memory). This file system (e.g., a portion of the RPMB partition) corresponds to the secure area of an SD card.

152. The Google Pixel 11, equipped with a Zoned UFS module, performs a step of creating a file system for user data on the storage device for storage of user data corresponding to a user data area of the SD card, wherein a size of the file system for secure data is determinant on a size of the file system for user data, the determination based on a lookup table providing a relationship between the sizes. For example, the Google Pixel 11 creates file systems for user data (e.g. the media itself such as encrypted DRM protected media). This information is stored along with user data on the storage of the eMMC / UFS storage. By way of further example, the Android Trusty TEE Secure File system utilized by Google Pixel 11 includes the capability to create superblocks, which can dynamically grow the size of the secure file system based on the size of the unsecured user content.

153. On information and belief, Defendant's direct infringement of the '749 Patent includes, but is not limited to, testing, development, troubleshooting, and other use in the United States. Defendant also uses the Accused Products at tradeshows in the United States to promote the sale of the Accused Products.

154. Defendant has and continues to indirectly infringe one or more claims of the '749 Patent by knowingly and intentionally inducing others, including Google's customers and end-users, to directly infringe, either literally or under the doctrine of equivalents, by making, using, offering to sell, selling and/or importing into the United States products that include infringing technology.

155. Defendant, with knowledge[62] that these products, or the use thereof, infringe the ’749 Patent at least as of the date of this Complaint, knowingly and intentionally induced, and continues to knowingly and intentionally induce, direct infringement of the ’749 Patent by providing these products to end users for use in an infringing manner. Alternatively, on information and belief, Defendant has adopted a policy of not reviewing the patents of others, and instructing its officers, agents, and employees to not review the patents of others, including specifically those related to Defendant’s specific industry, with the subject belief that there was a high probability that Defendant would learn of their infringing activities, thereby remaining willfully blind to the ’749 Patent at least as early as the issuance of the ’749 Patent.

156.

Defendant has induced infringement by others, including end users, with the intent to cause infringing acts by others or, in the alternative, with the belief that there was a high probability that others, including end users, infringe the ’749 Patent, but while remaining willfully blind to the infringement. Defendant has and continues to induce infringement by its customers and end-users by supplying them with instructions on how to operate the infringing technology in an infringing manner, while also making publicly available information on the infringing technology via Defendant’s website, product literature and packaging, and other publications. For example, Google makes available to its customers and end-users various materials that instruct them on how to use Google products in an infringing manner based on the product, such

[62] On information and belief, Google gained knowledge of the ’749 Patent on or about December 29, 2023, with the filing of a complaint for patent infringement in *Truesight Communications LLC v. Samsung Electronics Co., Ltd., et al.*, Case No. 2:23-cv-00643, Dkt. 1 (E.D. Tex. Dec. 29, 2023), which accused Android-based devices of infringing the ’749 Patent. Google was also subpoenaed in relation to this case and provided discovery related to several of the accused functionalities.

as user manuals.[63]

157. On information and belief, these instructional materials are prepared by Defendant or at the direction of Defendant. Because of Defendant's inducement, Defendant's customers and end-users use the Accused Products in a way Defendant intends and directly infringe the '749 Patent. Defendant performs these affirmative acts with knowledge of the '749 Patent and with the intent, or willful blindness, that the induced acts directly infringe the '749 Patent.

158. Defendant has indirectly infringed and continues to indirectly infringe one or more claims of the '749 Patent, as provided by 35 U.S.C. § 271(c), by contributing to direct infringement by others, such as customers and end-users, in this District and elsewhere in the United States. Defendant's affirmative acts of selling and offering to sell the Accused Products in this District and elsewhere in the United States and causing the Accused Products to be manufactured, used, sold, and offered for sale contributes to others' use and manufacture of the Accused Products such that the '749 Patent is directly infringed by others. The accused components within the Accused Products are material to the invention of the '749 Patent, have no substantial non-infringing uses, and are known by Defendant to be especially made or adapted for use in the infringement of the '749 Patent. Defendant performs these affirmative acts with knowledge of the '749 Patent and with intent, or willful blindness, that they cause the direct infringement of the '749 Patent.

159. Truesight has suffered damages as a result of Defendant's direct and indirect infringement of the '749 Patent in an amount to be proven at trial.

160. Truesight has suffered, and will continue to suffer, irreparable harm as a result of Defendant's infringement of the '749 Patent, for which there is no adequate remedy at law, unless

[63] For example, user instructions and assistance are available through the preinstalled My Pixel Application.

Defendant's infringement is enjoined by this Court.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Truesight prays for relief against Defendant as follows:

a. Entry of judgment declaring that Defendant has directly and/or indirectly infringed one or more claims of each of the Patents-in-Suit;

b. An order pursuant to 35 U.S.C. § 283 permanently enjoining Defendant, its officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them, from further acts of infringement of one or more of the Patents-in-Suit;

c. An order awarding damages sufficient to compensate Plaintiff for Defendant's infringement of the Patents-in-Suit, but in no event less than a reasonable royalty, together with interest and costs;

d. Entry of judgment declaring that this case is exceptional and awarding Plaintiff its costs and reasonable attorney fees under 35 U.S.C. § 285; and

e. Such other and further relief as the Court deems just and proper.

Dated: November 6, 2026

Respectfully submitted,

*/s/ Vincent J. Rubino, III*

Alfred R. Fabricant
NY Bar No. 2219392
Email: ffabricant@frlip.com
Peter Lambrianakos
NY Bar No. 2894392
Email: plambrianakos@frlip.com
Vincent J. Rubino, III
NY Bar No. 4557435
Email: vrubino@frlip.com
**Fabricant, Rubino & Lambrianakos LLP**
411 Theodore Fremd Avenue

Suite 206 South
Rye, New York 10580
Telephone: (212) 257-5797
Facsimile: (212) 257-5796

John Andrew Rubino
NY Bar No. 5020797
Email: jarubino@rubinoip.com
Michael Mondelli III
NY Bar No. 5805114
Email: mmondelli@rubinoip.com
**RUBINO IP**
1200 Harbor Blvd., 10th Floor
Weehawken Township, NJ 07086
Telephone: (201) 817-1840
Facsimile: (973) 535-0921

***ATTORNEYS FOR PLAINTIFF,***
***TRUESIGHT COMMUNICATIONS LLC***